UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:09-cr-00022-MMD-GWF |
| Plaintiff, | ORDER |
| v. | |
| JOSEPH PROKOP, ALAN L. RODRIGUES and WESTON J. COOLIDGE, | |
| Defendants. | |

## I.   INTRODUCTION

After a trial of approximately six (6) weeks in length on 20 counts, the jury returned a verdict of guilty on all counts against Defendants Weston J. Coolidge ("Coolidge") and Alan L. Rodrigues ("Rodrigues"), and all but two counts (counts 8 and 14) against Defendant Joseph Prokop ("Prokop"). (Dkt. no. 450.) Defendants have filed the following post-trial motions: (1) Coolidge's Motion for New Trial (dkt. no. 464), which Rodrigues and Prokop joined (dkt. nos. 465, 468); (2) Rodrigues' Motion for New Trial (dkt. no. 466), which Prokop joined (dkt. no. 469); (3) Rodrigues' Motion for Acquittal (dkt. no. 470), which Prokop joined (dkt. no. 471); and Prokop's Motion for Judgment of Acquittal and/or New Trial (dkt. no. 467). The Court grants the motions to join. (Dkt. nos. 465, 468, 469, 471.) The Court will address these motions in turn below.

## II.   RELEVANT BACKGROUND

The relevant facts supporting the Indictment are as follows. Dan Porter and Oryan Management and Financial Services ("Oryan") created a shopping website called "Tax

Break 2000" ("the Product").[1] They sold the Product directly and through other vendors. The Indictment focuses on the distribution and sale of the Product through one such vendor, National Audit Defense Network ("NADN"). NADN ultimately became the exclusive seller of the Product for Oryan. NADN provided clients with tax-related services, including preparation of income tax returns. Rodrigues was NADN's general manager, Coolidge was NADN's chairman and president, and Prokop was Oryan's national marketing director. Prokop was the liaison between Oryan and NADN, and he trained NADN's staff to sell the Product. Defendants claimed the Product would allow customers to claim legitimate income tax credits and deductions under the Americans with Disabilities Act ("ADA") and the Internal Revenue Code ("IRC").

The Indictment alleges that Defendants: (1) created the Product as not accessible to disabled persons so that Defendants could sell modifications to each customer; (2) told customers that purchasing the modifications entitled them to lawful income tax credit and deductions; (3) chose a sale price for the modifications that maximizes the income tax credit and deductions; (4) induced customers to sign promissory notes ("the Note" or "the Notes") for 80% of the purchase price of the modifications with no expectation that customers would pay the Notes; (5) created false IRS Forms 1099 to give the appearance that the Products sold were generating commission income to pay off the Notes; (6) prepared tax returns on customers' behalf that claimed tax credits and business expense deductions related to the Product for which Defendants knew the customers were not eligible; and (7) mailed said tax returns to customers. (Dkt. no. 1 at ¶¶ 14–20, 41, 45.)

## III.   LEGAL STANDARD

### A.   New Trial Under Fed. R. Crim. P. 33

Pursuant to Federal Rule of Criminal Procedure 33(a), "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice

---

[1]The Product had various names, including "ShopN2000" and "Mallforall."

so requires." Although determining whether to grant a motion for a new trial is left to the district court's discretion, "it should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (citation and internal quotation marks omitted). Moreover, the defendant bears the burden of persuasion. *United States v. Endicott*, 869 F.2d 452, 454 (9th Cir. 1989). Such an extraordinary remedy is appropriate, for example, when a court makes an erroneous ruling during the trial and that, but for that erroneous ruling, the outcome of the trial would have been more favorable to the defendant. *See United States v. Butler*, 567 F.2d 885, 891 (9th Cir. 1978).

## B.    Acquittal Under Fed. R. Crim. P. 29

The test for denial of a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 is the same as the test for reviewing a claim that the evidence is insufficient to support a conviction. *See, e.g., United States v. Tucker*, 641 F.3d 1110, 1118-19 (9th Cir. 2011); *United States v. Abner*, 35 F.3d 251, 253 (6th Cir. 1994). A criminal defendant's challenge to the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *Jackson* requires a court, upon such a motion, to construe the evidence "in the light most favorable to the prosecution" to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis in original).

## IV.    COOLIDGE'S MOTION FOR NEW TRIAL (Dkt. No. 464)

Coolidge's Motion is based on the contention that: (1) the Court erroneously permitted the Government's expert witness, Evelyn Kay Fall, to testify as to Defendants' intent; (2) Fall improperly assessed the credibility of witnesses; and (3) the Court erroneously admitted evidence relating to Coolidge's association with Oryan Management, Inc. ("OMI"). The Court will address each argument below.

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**A.     Claim Regarding Fall's Testimony Of Defendants' Intent**

The scope of Fall's testimony was the subject of a pre-trial motion. The Court determined that Fall would be allowed to testify to the Internal Revenue Code, her opinion of which claimed deductions were not allowed given her understanding of the IRC. (Dkt. no. 374.) In making this ruling, the Court rejected Defendants' argument that Fall should not be permitted to testify as to which claimed deductions were not allowed. In *United States v. Clardy*, 612 F.2d 1139, 1153 (9th Cir. 1942), which involved the deductibility of interest where the Government contended that the claimed interest payment was a sham, the court found that while "the opinion on the deductibility of the interest was intimately related to the question of [Defendant]'s guilt or innocence, it was still admissible." The court reasoned that under Federal Rule of Evidence 704 "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *See id.* (internal citation omitted). Additionally, the court concluded that any potential prejudice was dispelled by the court's instruction to the jury regarding the weight given to expert testimony. *See id.* In light of *Clardy*, this Court concluded that, the jury would be instructed on the weight given to expert testimony and Defendants would have the opportunity to cross-examine Fall.[2] However, the Court agreed with Defendants that Fall should not be permitted to testify as to Defendants' state of mind, including Defendants' intent in counseling taxpayers.

Coolidge contends that Fall did indeed testify as to Defendants' collective intent. However, the cited testimony does not support Coolidge's argument. In the first cited testimony, Fall testified as to the amount of disabled access credit claimed — $5,000 taken off the tax filer's tax liability — and claimed expense deductions — $821 assuming

---

[2]At trial, the jury was so instructed. And Defendants' counsel did put Fall through rigorous cross-examination. For example, counsel for Coolidge questioned Fall about assumptions she made in calculating the potential tax loss to the IRS. (Dkt. no. 458 at 14-15.)

a 15% tax rate — on a given tax filing, resulting in certain tax benefit to the taxpayer and loss to the IRS — $5,821. (Dkt. no. 464 at 5; dkt. no. 457 at 86.) Fall then extrapolated this information to quantify the potential tax loss to the IRS based on the number of Products sold by NADN during the period of the Indictment.[3] (Dkt. no. 457 at 85; Exh. 338.) Fall offered a straightforward calculation based on admitted evidence and certain assumptions. On cross-examination by Coolidge's counsel, Fall explained that one assumption she made was that for each Product sold, the tax filer would have claimed the full $5,000 disabled access credit. (Dkt. no. 458 at 14.) Fall further admitted on cross-examination that her testimony related to potential tax loss to the IRS, but she did not know the actual tax loss. (*Id.* at 15.) Fall's testimony did not touch upon or even implicate Defendants' state of mind relating to the Product or marketing of the Product or their good faith belief that the Product was legal.

Coolidge further argues that Fall's testimony regarding Defendant's intent was compounded by the Court's admission of a piece of summary evidence — entitled "Summary of Total Potential Tax Loss" (Government Exh. 338) — as demonstrative evidence. (Dkt. no. 457 at 84.) However, as the Court found when admitting Exh. 338, the summary merely offers a mathematical calculation of the total potential tax loss based on the number of Products sold by NADN and the amount of claimed disabled access credit and claimed business expenses. Fall explained the calculation during her testimony. (*Id.* at 84-89.) Exh. 338 does not suggest nor would a reasonable jury infer that the summary calculation evidences Defendants' state of mind.

**B.      Claim Regarding Fall's Assessment of Witness Credibility**

Coolidge argues that Fall improperly intruded into the province of the jury by assessing the credibility of other witnesses. The Court finds that the cited testimony does not support Coolidge's argument.

---

[3]Fall testified that NADN sold 18,052 products, resulting in a potential tax loss of $105,080,692 (18,052 x $5,821). (Dkt no. 457 at 84; Exh. 338.)

Coolidge argues that, on cross-examination by Rodrigues' counsel, Fall implicitly suggested that certain witnesses were not credible by testifying that she did not consider their testimony in reaching her opinion. For example, Coolidge relies on the following cross-examination of Fall by Rodrigues' counsel:

> Q: So you've already concluded that no matter what these people say about what they intended to do, or even what they did with respect to marketing this, that it wasn't enough, in your opinion, for any of these taxpayers to qualify for legitimate business deductions with respect to this Product business?
>
> A: That's what the facts are brought out in the evidence during this trial.

(Dkt. no. 458 at 31:5-12.) Coolidge relies on the above exchange to argue that Fall improperly assessed witness credibility. The Court disagrees with Coolidge's observation. Fall's testimony went to what she remembered to be testimonies of other witnesses and evidence offered in the case, not her opinion as to any of the witnesses' credibility or even her assessment of these witnesses' testimonies. How much weight, if any, the jury gave Fall's testimony depended on what they recalled to be the evidence admitted and whether their recollection differed from hers. Moreover, Coolidge disregards the next exchange between Rodrigues' counsel and Fall:

> Q:  And if the facts are interpreted different, if people remember different things about what these individuals said they did or didn't do, you could be wrong with respect to some of these taxpayers, correct?
>
> A: I suppose.

(*Id.* at 31:13-17.) Fall thus admitted that her recollection about other witnesses' testimonies could be wrong.

Coolidge also relies on Fall's testimony that she disagreed with the testimony of another Government witness, Jeff Schnepper. (Dkt. no. 464 at 10.) The Government offered Schnepper, an accountant and attorney with an LLM in tax and years of experience as Microsoft's tax expert online, to testify about the opinion he gave to Dan Porter and Oryan about the legality of the Product. On cross-examination of Fall, Rodrigues' counsel elicited Fall's admission that she disagreed with Schnepper's "opinion" that how a product was marketed doesn't have much impact on the legitimacy

of the business if the business was legitimate. (Dkt. no. 458 at 33.) Because both Fall and Schnepper's testimonies involved their expert opinions, that Fall disagreed with Schnepper's opinion may have in fact undermined the Government's case if the jury found Schnepper to be more credible. In any case, Fall's testimony does not support the claim that Fall invaded the province of the jury by assessing Schnepper's credibility.

## C.   Claim Regarding Coolidge's Association with OMI

In its pretrial ruling, the Court permitted the Government to offer evidence that Coolidge assisted Dan Porter to create Oryan Management, Inc. ("OMI"). The Court based its decision on the Government's representation that OMI was to take the place of Oryan, which created, marketed, and serviced the Product. The Court agreed with the Government that Coolidge's conduct was inextricably intertwined with the allegations in the Indictment that OMI operated as a shell company of Oryan and admitted this evidence under Rule 404(b), finding that the information would lay the necessary foundation regarding Coolidge's alleged intentional participation in the conspiracy at issue in this case.[4] Coolidge now argues that the Government's use of evidence relating to OMI exceeded the scope of the Court's ruling and confused the issue for the jury. The Court disagrees.

The evidence offered at trial further bolsters the Court's finding that Coolidge's involvement in the creation of OMI was inextricably intertwined with the allegations in the Indictment. The evidence offered shows that Coolidge's involvement in the creation and management of OMI permitted Oryan to continue to market and sell the Product through NADN. Porter testified that Rodrigues had referred him to Coolidge when Porter expressed his concerns about the promissory notes and its tax implications. (Dkt. no. 496 at 107.) Government Exh. 316 shows that in December 2001, Coolidge met with Dan Porter to discuss the creation of a shell company, ultimately named OMI,[5] to

---

[4]The Court permitted Coolidge to assert a standing objection to all evidence admitted during trial relating to his involvement in the creation of OMI.

[5]OMI's previous name was Computer Systems. Exh. 294.

1   essentially allow Porter to continue to sell the Product. (Exh. 316; dkt. no. 496 at 108-

2   09.) Coolidge thus became involved in the selling of the Product through OMI months

3   before he became president of NADN in May 2002. With Coolidge's assistance, OMI

4   subsequently acquired the stock of NADN from its prior owners to permit NADN to

5   continue to operate, market and sell the Product.[6] (Exh. 250-252; dkt. no 496 at 176-

6   182.) By that time, according to Porter, he wanted NADN to stay in business because

7   one hundred percent of the sale of the Product was made by NADN. (Dkt. no. 496 at

8   166.) The admitted evidence relating to OMI shows that the creation of OMI further the

9   alleged conspiracy in that Oryan and NADN were able to continue to market and sell the

10  Product. Coolidge's entanglement in Oryan, NADN and OMI was part of his significant

11  participation in furthering the alleged conspiracy and could not have been separated

12  from the alleged conspiracy.

13  **V.    RODRIGUES' MOTION FOR ACQUITTAL (Dkt. No. 470)**

14      Rodrigues argues that the evidence is insufficient to sustain the jury verdict

15  because the Government failed to prove: (1) the unlawfulness of the Product; (2)

16  Rodrigues' involvement in the alleged conspiracy; and (3) Rodrigues' intent.

17      **A.    Claim Regarding Unlawfulness of the Product**

18      Rodrigues argues that the evidence is insufficient to sustain the jury's verdict

19  because the Government failed to offer any testimony by a qualified expert witness that

20  the Product was definitively illegal, that the Product was not a viable vehicle for operating

21  a business, that the promissory note was a sham or that the disabled access credit did

22  not apply to businesses created after 1991. However, construing the evidence in the

23  light most favorable to the Government, the Court finds that the evidence sustains the

24  jury's verdict.

25

26  _____

27  [6]In fact, Cort Christie's testimony and Exh. 249 show that while Porter loaned $100,000 in cash to NADN, the promissory note to secure the loan was made to OMI. The stock purchase agreement involving the sale of NADN to OMI is dated March 12, 2002. Exh. 252.

28

The evidence is sufficient to support the jury's finding that the Product as marketed and sold was unlawful. Testimonies from Fall, Robert Stoval and Joe Tigani support the finding that the Product was unlawful. While there were testimonies about provisions of IRC 44, including whether the home based business created with the Product was an eligible business and whether the ADA applies to the Internet, these issues are not pertinent to the legality of the Product as presented in this case. This is because the Government offered evidence that the Product, as marketed and sold, was a tax product offered and priced to maximize tax benefits, and the Note was a sham. The evidence offered at trial, particularly through testimony of Dan Porter, shows that the Product was created to pass IRS scrutiny with the inclusion of the Note and, toward the latter part of the scheme, the issuance of 1099 forms. Porter and Joe Orgell testified that the Product was priced to create a cash positive for customers. Porter testified that no money exchanged hands when customers clicked through banner ads to pay down the Note. Porter also testified that Oryan, the holder of the Notes until September 2002, did not receive payment from the "click throughs" to pay down the Notes. Several customers testified that they were told they did not have to pay down the Note. Rocky Gannon testified Rodrigues told him he would not have to pay down the Note and that the Product would be a tax savings. Gary Allgood, an NADN sales representative, testified that he purchased the Product, understood he did not have to pay the Note, and told customers he didn't have to pay the Note. Allgood understood that $2 per click would reduce the amount of the Note but he did not do the "click throughs" and no one pursued payment under the Note. While some customers, such as Harold Routzang, John Aloe and Kathy Bumpas, testified that they purchased the Product because they wanted to start a home-based business, they also testified that they were told the tax savings would be greater than the purchase price and they need not worry about the Note.[7]

---

[7]For example, Harold Routzang testified he was interested in starting a business and did try to promote the Product. He was also told the Note would be paid off at $2 per click.

Alphonso Lindsey and Rocky Gannon testified they did not do any work to promote their website Product as a home based business. Daniel Ellison testified he bought the Product to obtain the $5,000 tax credit to reduce his tax liability. Ann Cirillo, a special education teacher, testified she purchased the Product for a couple of consecutive years for the purposes of lowering her taxes because NADN sales staff told her it was a way to help reduce her tax liability; she was not told that the Product was a home based business opportunity nor was she looking for a business opportunity. The Government's main expert witness, Evelyn Kay Fall, explained why the disabled access credit and deductions would be disallowed even assuming the ADA applies to the Internet. While she testified under cross-examination by Rodrigues' counsel that she based her opinion on what she remembered to be the evidence in the case, and Rodrigues' counsel tried to demonstrate that Fall ignored testimonies of some of the customers as to their intent with respect to the Product, her testimony overall is sufficient to support the jury's verdict that the Product as marketed and sold was not legal.

**B.    Claim Regarding Rodrigues' Involvement in Alleged Conspiracy**

Rodrigues next argues that the Government failed to show he was an important participant in the conspiracy or joined the conspiracy at any particular point in time because he did not make the decision to sell the Product or engage outside counsel to provide their legal opinion about the legality of the Product. Again, the Court disagrees.

The Government introduced evidence through Dan Porter's testimony that detailed extensive dealings with Rodrigues as well as Coolidge regarding the continued sale of the Product despite IRS scrutiny. Porter testified that he called Rodrigues and Coolidge separately and told them about the IRS Criminal Division's search of Oryan's offices.[8] Porter told them he was done and did not want to sell the Product any longer because the IRS's raid solidified his belief that the Product was wrong. (Dkt. no. 497 at 22-23; 26-27.) Porter testified he gave Rodrigues and Coolidge a copy of the search

_____

[8]The IRS executed a search warrant on Oryan's offices in July 2002.

warrant and the supporting affidavit when they met in Las Vegas, and the affidavit explained the IRS' position with respect to the legality of the Product. (*Id.* at 30-38). They discussed how to continue to sell the Product and, in response to Porter's claim that he no longer wanted to sell the Product, Coolidge said he would find someone to take over for Porter. (*Id.*) Porter also testified that he had discussion with Rodrigues and Coolidge where they told him they wanted to sell the Product for about "six months, eight months, two years," to make enough money so there would not be a need to sell the Product anymore.[9] (*Id.* at 44-45.) Porter also testified that he met with Rodrigues and Coolidge at the Rio Hotel in Las Vegas to discuss the "click throughs" and the fact that there was no money paid to anyone as a result. (*Id.* at 90-93.) Porter testified that in early 2003, he, Coolidge and Rodrigues had a meeting with a CPA where they discussed the need to have 1099 forms issued for the "click throughs." (*Id.*) Coolidge's handwritten notes support Porter's testimony relating to some of these discussions. (*See* e.g., Exh. 282.) Two former NADN employees, Panos Pappagianapolous and Marie Orie, testified they had discussions with Rodrigues relating to the legality of the Product. In addition, the Government's Exh. 265 shows that at the 341 meeting of creditors in connection with NADN's bankruptcy, Coolidge referred Rodrigues to respond to questions about the Product. The jury may infer from this evidence that Rodrigues was more familiar and involved with the sale of the Product.

Rodrigues correctly pointed out in his motion that he did not hire the outside attorneys, Michael Potter or Curtis Shaw, to prepare their opinion letter. However, Potter testified that Rodrigues asked him to change his opinion letter to modify the chance that the Product would pass legal scrutiny; and Porter testified he hired Shaw at Rodrigues

///

_____

[9]Under cross examination, Porter changed the length of time that Rodrigues and Coolidge told him they would need to sell the Product. Porter also testified that he met with Rodrigues, Coolidge and Robert Goetsch in December 2003 to discuss the risks and rewards of continuing to sell the Product because he was concerned about being paid by NADN and the consensus was to continue to sell until ordered to stop.

1  and Coolidge's direction and they asked him to ask Shaw to falsely date the opinion

2  letter for December 2002.

3       The evidence is sufficient for the jury to find that Rodrigues was intimately

4  involved in the alleged conspiracy.

5              **C.    Claim Regarding Rodrigues' Intent**

6       Finally, Rodrigues argues that the Government failed to offer evidence to show

7  when he formed the requisite intent or knowledge that he violated tax laws. To the

8  contrary, the Court finds that the evidence, viewed in the light most favorable to the

9  Government, is sufficient for the jury to find that Rodrigues knew the Product was not

10 legal. The jury could infer from the testimony of Rocky Gannon that Rodrigues knew the

11 Note was a sham. Gannon testified that Rodrigues told him he would not have to pay

12 down the Note and the Product would be a tax savings. The jury could also infer from the

13 evidence discussed above that Rodrigues knew the Product was not legal, but that he

14 directed the continued sale of the Product until ordered to stop by the IRS.[10]

15 **VI.   RODRIGUES' MOTION FOR NEW TRIAL (Dkt. No. 466)**

16      Rodrigues asserts three grounds to support his request for a new trial: (1) the jury

17 verdict is against the weight of the evidence; (2) the cumulative impact of the Court's

18 erroneous rulings on two categories of evidence deprived him of a fair trial; and (3)

19 Porter's testimony was not reliable and cannot serve as a basis for findings of guilt. The

20 Court agrees with the Government that this is not one of those "exceptional cases in

21 which the evidence preponderates heavily against the verdict" to compel a new trial.

22 ///

23

24      [10]Defendants raised the same argument in their oral Rule 29 motion made at the
25 close of the Government's case. Defendants argued: (1) that the evidence is insufficient
   to show a conspiracy existed in that they did not enter into an agreement with Porter to
   defraud the IRS; (2) even if the Court were to consider Porter's testimony that he had
26 fraudulent intent, Porter did not communicate his intent to Defendants; and (3)
   Defendants did not agree to sell the Product with the intent to defraud the IRS. In
27 rejecting Defendants' arguments, the Court cited evidence supporting Defendants'
   involvement and their individual intent.
28

*Pimentel*, 654 F.2d at 545. The Court will address the first and third arguments in tandem.

### A.   Claim Regarding Weight of the Evidence and Porter's Testimony

The gist of Rodrigues' argument is that the evidence does not support the jury's finding of criminal intent, particularly if the Court discounts Dan Porter's testimony. With respect to Dan Porter, the Court does not agree with Rodrigues' argument that Porter's testimony should be discounted entirely as unreliable.[11] The Government correctly points out examples of where Porter's testimony is supported by other evidence. As discussed above, Coolidge's notes also corroborate Porter's testimony. Considering Porter's testimony as summarized herein, the evidence shows that Defendants, including Rodrigues, knew that the Product as marketed and sold was unlawful. In fact, Porter testified that they (Porter, Rodrigues, Coolidge and Goetsch) discussed the risks involved and agreed to continue to sell the Product until ordered to stop. However, even if the Court were to discount Porter's damaging testimony, the Court does not find that the evidence preponderates heavily against the jury's verdict. While proof of each individual defendant's intent was probably the most challenging aspect of the trial for the Government, the Government offered circumstantial evidence that is sufficient for the jury to find criminal intent.

Defendants assert that they acted in good faith and lacked criminal intent. The Court will address some examples of evidence offered, aside from Porter's testimony, during the long course of trial that supports finding that Defendants had the required knowledge and criminal intent. Stovall and Tigani testified that Rodrigues had reviewed the Stovall Memo dated April 11, 2001.[12] (Exh. 204.) The Stovall Memo discussed various aspects of the Product and raised several concerns about the legality of the

---

[11]Nor does the Court agree that the evidence supports Defendants' theory that Porter was the mastermind behind the scheme and deceived them all.

[12]Coolidge became aware of the Stovall Memo in February 2002. (Exh. 282 at 4.)

Product. In particular, the Stovall Memo warned that if the IRS determined there "is no economic substance to the activity, and that indeed, it was organized and sold solely for its purported tax advantage(s)," then individuals involved may be subject to criminal and civil penalties. (*Id.)* While Stovall and Tigani ultimately recommended getting a second and then a third opinion, the evidence supports the finding that the attorneys selected to provide additional legal opinions lacked the requisite expertise to render these opinions. Rodrigues received recommendations from Tigani and Stovall of law firms in Washington D.C. with expertise in tax law to hire to obtain a legal opinion. (Dkt. no. 491 at 37-38.) This occurred twice and on both occasions, their recommendations were rejected.[13] (*Id.* at 47, 49-50, 98.) With respect to Michael Potter's opinion letter, he testified he was asked to address the applicability of the ADA to the Internet and was told that other aspects of the Product would be addressed by NADN's employees. In fact, Potter testified that he told Rodrigues that NADN should obtain other opinion letters before selling the Product. (Dkt. no. 506 at 49-50, 88.) Potter testified that Rodrigues asked Potter to change the odds in his opinion letter because the original draft, putting the odds at a one-in-three chances of success, would not be helpful.[14] (*Id.* at 32-35, 81-82, 123-24.) Potter's final letter changed the odds to "one-in-three and more likely closer to one-in-two in terms of success" as Rodrigues requested. (Exh. 116.) Other evidence offered

---

[13]Cort Christie testified that he made the decision to retain Michael Potter. While Rodrigues was not involved in rejecting their recommendation the first time, he knew that the attorney hired to provide the second opinion was not one of those with expertise in tax laws recommended by Stovall and Tigani. In connection with the solicitation of a third opinion letter, Stovall and Tigani prepared a draft letter to outline the issues they proposed should be addressed, and Stovall discussed the letter with both Coolidge and Rodrigues. (Dkt. no. 491 at 50-50.) The jury may infer that either Coolidge or Rodrigues rejected their recommendation since Shaw was hired instead. Even if Rodrigues did not make the decision, he again knew that qualified counsel recommended by their own internal experts were not retained. Rodrigues' involvement and knowledge that qualified counsel was not selected may have caused the jury to question his claim that he in good faith relied on Potter and Shaw's opinions.

[14]Potter further testified that he felt somewhat pressured by Rodrigues to change his letter and he had some concerns that he would not be paid for the balance of his fees. (Dkt. no. 506 at 36-37.)

shows that Rodrigues was on notice that he should not rely on Potter's letter. For example, Les Shapiro, an attorney who was a consultant for NADN and a member of its Tax Advisory Board, wrote a letter to Rodrigues dated May 15, 2002, that Potter's letter "doesn't get into the substance of the NADN program." (Dkt. no. 491 at 88; Exh. 225.) With Curtis Shaw, a simple comparison of his letter with Potter's letter shows that Shaw plagiarized Potter's letter. Stovall testified he pointed this out to Rodrigues.[15] (Dkt. no. 491 at 65.) The cited evidence supports the conclusion that Rodrigues was on notice of the legal issues with the Product, but chose to ignore the warnings and instead continued to look for ways to continue to sell the Product. For example, the Stovall Memo warned that if the IRS determined the Product was organized solely for its tax benefits, they may pursue criminal and civil penalties. Yet, the Government offered ample evidence for the jury to find that with Defendants' knowledge, NADN marketed and sold the Product as a tax product yielding tax benefits. Why else would NADN market and sell the Product to some of the customers or their spouse for multiple years?[16]

## B.   Evidentiary Rulings

Rodrigues argues that Defendants were prejudiced by the Court's erroneous admission of evidence relating to Coolidge's involvement with the creation of other entities, including OMI, and exclusion of evidence relating to the unclear nature of the laws and the IRS' positions. As discussed above, the Court does not find that it made an error in admitting evidence relating to Coolidge's involvement in the creation of OMI. The Court agrees with the Government that Rodrigues has not demonstrated how he is prejudiced by evidence relating to Coolidge's involvement in the creation of shell companies that formed part of the alleged conspiracy. In fact, the evidence offered

---

[15]Coolidge's notes show this issue was discussed at the Tax Advisory Board meeting on June 9, 2003 where Rodrigues was present. (Exh. 183.)

[16]James Johnston and Ann Cirillo testified they bought the Product for multiple years for the purpose of tax benefits.

overall supports the finding that doing business through corporate entities was nothing out of the ordinary. For example, Cort Christie testified about one of his entities, Nevada Corporate Headquarters, providing corporate services and acting as a nominee. Moreover, Coolidge's involvement with the creation of other entities was inextricably intertwined with the allegations in the Indictment. As to the exclusion of evidence relating to the unclear nature of the laws during the period alleged in the Indictment, the Government correctly notes that the Court did permit limited inquiries about the state of the law, particularly in connection the cross-examination of Stovall, Tigani, Potter, Richard St. John and Fall. In any event, the Court disagrees that it was erroneous to exclude evidence, which Prokop's counsel sought to admit, relating to the alleged unsettled nature of certain IRC provisions that deal with claiming credits under the Americans with Disabilities Act and the internal IRS discussions relating to the Product and the auditing of returns claiming the tax shelter. The evidence presented at trial does not change the Court's pretrial findings that any claimed uncertainty was irrelevant to the Defendants' scheme as alleged in the Indictment and presented at trial. (Dkt. no. 374.) As discussed above, the evidence was sufficient for the jury to find that the Product as marketed and sold involved a tax scheme where customers paid about $2495 for the Product, and in return, claimed $5000 disable tax credits (for the most part) and about $5000 as business expenses on their schedule C. Thus, it is entirely irrelevant whether the ADA applies to the Internet or whether the disabled tax credit is limited to modifications of existing physical businesses. Exclusion of evidence calling into question the purported uncertainty of the tax law and the IRS's internal debate about how to approach auditing of the tax shelter was proper under Fed. R. Civ. P. 402 and 403.

### VII.  PROKOP'S MOTION FOR JUDGMENT OF ACQUITTAL AND/OR NEW TRIAL (Dkt. No. 467)

####  A.  Motion for judgment of Acquittal

Prokop asserts the general argument that the Government failed to prove his knowledge about the legality of the Product and his criminal intent. As the Court found in

denying his Rule 29 motion on this same ground, the evidence is sufficient to support Prokop's knowledge and intent. The following is an example of some of this evidence aside from the evidence cited in the Government's response. Prokop was involved in preparing the marketing materials and sales scripts for the Products used by NADN. Porter testified he told Prokop what information should not be disclosed to customers in the marketing of the Product. Porter told Prokop to refrain from telling customers that the Product was an investment because in that case customers would not be eligible for the tax benefits.  Porter also told Prokop to avoid telling customers that the Product was a tax shelter because a whole set of rules would then apply. Drew Orgell testified that, after the IRS search of Oryan's offices in July 2002, Prokop told him that Prokop was in "hot waters" with Porter because he had described the Product to the IRS undercover agent in a way that he shouldn't have and contrary to the way that Porter wanted him to present the Product. Prokop told the agent that the most a customer would ever have to pay for the Product is $2500 because of the escape clause. (Exh. 63.) The jury may have construed this as Prokop's knowledge that the Note was a sham. Moreover, Prokop was aware of the IRS's search of Oryan's offices. Porter reviewed and discussed with Prokop the IRS search warrant and the supporting affidavit showing the IRS' position about the legality of the Product, including the criminal statutes that may apply. (Dkt. no. 497 at 18, 21-22.) Yet, Prokop continued to participate in the sale and marketing of the Product. Even if Porter directed Prokop's activities, the evidence is sufficient to support the jury's finding that Prokop knew about the legal issues with the Product, but he continued to be involved in promoting the sale of the Product.[17]  Viewed in the light most favorable to the Prosecution, a rational trier of fact could have found the

---

[17]For example, as the Government noted in its response, Prokop was copied on emails exchanged with David Tedder in which he raised the issues with the application of the disabled access credits to businesses that were not in existence before passage of the ADA. (Dkt. no. 475 at 6; dkt. no. 305.) Another example is Prokop's involvement in the drafting of the sales scripts used by NADN's sales team and training of NADN's sales team on how to sell the Product. This evidence would further supporting the finding that Prokop knew the Note was a sham.

1    element of criminal intent beyond a reasonable doubt to support a verdict against
2    Prokop.

3    **B.    Motion for New Trial**

4    Prokop presented his motion based on two separate categories of arguments:
5    issues that arose during trial and issues that were the subject of pretrial motions. With
6    respect to the latter category, Prokop in a perfunctory manner summarizes the issues
7    raised in previous motions. The Court is not persuaded to revisit these issues, let alone
8    to find that it erred in its previous rulings. The Court relies on its previous rulings and will
9    not repeat them here. As to the former category, Prokop includes a general argument of
10   jury misconduct, part of which was raised and addressed during trial. Nonetheless, the
11   Court will address this argument again.

12   **1.    Claim of Inconsistent Verdict**

13   Prokop argues that because the jury found him guilty on all but two counts (counts
14   8 and 14), the verdict is inconsistent and should be set aside. (Dkt. no. 450 at 6.) The
15   Court disagrees.

16   The Indictment includes 14 counts (counts 2 through 16) of aiding in the
17   preparation of materially false income tax returns in violation of 26 U.S.C. § 7206(2).
18   (Dkt. no. 1 at 9-10.) The Indictment alleges that Defendants "willfully aided and assisted
19   in, and procured, counseled, and advised the preparation and presentation to the
20   Internal Revenue Service" individual returns for certain years that "were false and
21   fraudulent as to material terms." (*Id.* at 9:9-15.) These counts relate to different
22   taxpayers, and in some counts, the same taxpayers for different tax years. For example,
23   count 8 involved the 2003 tax returns of Richard and Judith Howard and the allegation
24   that they claimed business expenses associated with the Product. (*Id.* at 10.)  Count 14
25   involved the 2003 tax returns of Anthony and Christine Prato, who allegedly claimed a
26   portion of the disabled access credit as well as business expenses associated with the
27   Product. (*Id.*) These taxpayers were not identified in any of the other remaining 12
28   counts involving § 7206(2).

As the Supreme Court reiterated in *United States v. Powell,* 469 U.S. 57, 58 (1984), "a criminal defendant convicted by a jury on one count could not attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count." *Id.* (citing *Dunn v. United States,* 284 U.S. 390 (1932)). In *Powell*, the government did not dispute the contention that the jury's verdict — they acquitted defendant of conspiracy to possess cocaine and possession of cocaine, but found her guilty of using the telephone to facilitate those offenses — was inconsistent. *Id.* at 479. However, the Court declined to create an exception to the established rule in *Dunn,* even though the jury's verdicts "cannot be rationally reconciled." *Id.*

Here, unlike in *Powell*, the jury's decision to acquit Prokop on two counts but to convict on the other 12 counts under § 7206(2), involving different taxpayers, does not show any inconsistency. This is because the jury's conviction of Prokop on the other 12 counts (counts 2-7, 9-13 and 15-16) did not require them to convict him on counts 8 and 14.[18] Counts 8 and 12 did not involve the same taxpayers as the other 12 counts of § 7206(2) violations. However, even accepting Prokop's argument that the jury's verdict is inconsistent, such inconsistency cannot be attacked under the *Dunn* rule. *Powell*, 469 U.S. at 58.

## 2.    Claim of Jury Misconduct

Prokop cites to a number of incidents involving several jurors, but he fails to explain how these incidents show any misconduct. The Court will address each of Prokop's cited incidents below.

---

[18]As the Court recalls, the evidence in general shows that the taxpayers identified in counts 2 through 16 purchased the Product from NADN but received documents about the Product from Oryan. The Court does not recall whether there was evidence of any communications or documents from Oryan to the taxpayers identified counts 8 and 14. The absence of such evidence may be a reason why the jury decided not to convict Prokop on these two counts, but such a determination by the Court would be mere speculation. As the *Powell* Court noted as another reason for not allowing defendants to challenge inconsistent verdicts, "an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." *Powell*, 469 U.S. at 66.

The Court previously addressed Prokop's claim with respect to Juror 12.[19] Alternate Juror 1 had informed the courtroom administrator that Juror 12 had been making comments as the testimony progressed. The Court requested a note from Alternate Juror 1, who stated that Juror 12 constantly made comments about witnesses. The Court informed counsel of this development and counsel agreed that the Court should give the jury a general instruction to remind them not to discuss the case.[20] The next day, the Court informed the parties of its intention to make further inquiry of Juror 12, and then to conduct a separate polling of the remaining jurors. The Court explained that the inquiry would be whether there had been actual discussions among the jurors about the case, whether any discussion has affected each juror's view of the case and whether the jurors can keep an open mind despite any discussions. The Government's counsel suggested that the Court keep the inquiry general to avoid singling out Juror 12 and avoid any issue in case Alternate Juror 1 ended up being seated. Prokop's counsel ultimately concurred and further observed that the entire process would be intimidating for Juror 12 as well as the other jurors. The Court then held a conference with Juror 12, counsel and the parties in a separate jury room. The Court began by explaining to Juror 12 its observation that Juror 12 appeared to have been making comments to her fellow jurors. Juror 12 acknowledged that she had made comments, but stated in response to the Court's inquiry that she did not discuss the case with the other jurors. In response to the Court's question, Juror 12 indicated that she has continued to keep an open mind. The Court then convened the remaining jurors and polled them as a group. They were asked whether anything has occurred in the trial that would improperly influence them and whether they have discussed the case with each other. Their collective response was negative. They were asked to raise their hands if they have not continued to keep

---

[19]There is a discrepancy in how the parties referred to the jurors. This was in part due to the Court's failure to clarify the juror numbering on the record after the Court excused Juror 6 during the first week of trial. Alternate Juror 1 became Juror 12.

[20]This exchange with counsel occurred on May 15, 2014. (Dkt. no. 504 at 78-82.)

an open mind. No hand was raised. They also confirmed that they have not reached a decision about the case.

Outside the presence of the jury, Prokop's counsel moved to dismiss Juror 12, citing his client's discomfort with Juror 12 because of her body language (i.e., she did not make eye contact on significant questions). The Court denied his motion, finding that there was no basis to remove Juror 12. In terms of Juror 12's demeanor, she did appear to be somewhat uncomfortable with the separate proceedings. Juror 12 was placed in an intimidating environment where she had to answer questions posed by the presiding judge in front of five attorneys and three defendants. Participants sat at a round table and Juror 12 appeared to try to make eye contact with the undersigned and those around the table. In such a setting, it would have been surprising had Juror 12 not revealed any physical signs of nervousness. More importantly, Juror 12's response and the Court's polling of the other jurors show that the jurors did not have any discussion about the case, were not improperly influenced by anything that may have occurred, had not reached an opinion and continued to keep an open mind about the evidence. Under these circumstances, the Court found that no misconduct had occurred.[21] As the Ninth Circuit has opined, "[w]hat is crucial is 'not that jurors keep silent with each other about the case but that each juror keep an open mind until the case has been submitted to the jury.'" *Davis v. Woodford,* 384 F.3d 628, 653 (9th Cir. 2004) (quoting *United States v. Klee,* 494 F.2d 394, 396 (9th Cir. 1974)). Prokop's cursory argument in this current motion does not persuade the Court to reconsider its finding that Juror 12's conduct did not rise to the level of misconduct that would compel her dismissal, let alone a new trial.

Prokop contends that the Court excused Juror 7 without obtaining an explanation from her when she provided a note at the end of the second day of deliberations.[22] The

---

[21]Indeed, Prokop's counsel acknowledged that no misconduct had occurred, but sought to remove Juror 12 because of his client's discomfort with her demeanor.

[22]Prokop incorrectly referred to this juror as Juror 8. Again, this juror was initially seated as no. 8, but became Juror 7 after the Court excused Juror 6 during the first week of trial.

records do not support this contention. On the afternoon of May 23, 2014, the second day of jury deliberations, the Court received a note from Juror 7, stating that she "does not have the luxury of returning on Tuesday to resolve this and may an alternate be brought in to resolve the case?" The Court notified counsel by phone and asked counsel to return to the courtroom for the Court to make further inquiry of Juror 7. In the meantime, the Court received a note from another juror stating that she was feeling pressured by a fellow juror to come to a decision that day. The Court informed counsel of this note and determined that the issue would be resolved given that the Court planned to direct the jurors to recess for the three day weekend and resume deliberations on Tuesday, May 27, 2014.  The Court proposed bringing the jury into court to give them their recess instruction and send them home and having the courtroom administrator ask Juror 7 to return to the courtroom for the Court to make further individual inquiry about her note. All counsel, including Prokop's counsel, agreed with this approach.[23] In the presence of counsel, Juror 7 stated that she thought the trial would take five to six weeks based on the summons and she had patients — ten patients a day — who were scheduled for tests on Tuesday, May 27, 2014, and had been told to fast for their tests. These patients had to complete these tests for surgery on Wednesday and Thursday, and Juror 7 had no one to cover for her. Counsel for Coolidge then moved to excuse Juror 7 and counsel for the other parties, including Prokop, explicitly stated they did not have any objection. Prokop cannot complain about the Court's handling of Juror 7's excuse when he did not object to her dismissal. To be clear, even if Coolidge's counsel did not move to excuse Juror 7, the Court would have excused her for good cause.

Prokop also offers as another example of juror misconduct the response from Alternate Juror 1 when she was called in as a replacement. This juror asked if she was

---

[23]Prokop refers to the incident with the note from the juror who indicated she felt pressure to reach a decision that Friday afternoon. However, he agreed with the Court's decision not to make further inquiry. To the extent this juror felt pressure, the problem was obviated by the Court directing the jury to recess and resume deliberations after the three day weekend.

being "punked" when she was notified about the need to join the jury's deliberations. It is not clear to the Court why such a reaction would show juror misconduct or any impropriety. In any event, before the jury began their deliberations on Tuesday, May 27, 2014, the Court instructed them to disregard their previous deliberations and start over.[24]

The examples of issues that occurred with respect to the jurors over the course of the six week trial, whether considered individuality or in totality, do not support Prokop's claim of juror misconduct to warrant a new trial.

### 3.    Claim of Pre-accusatory Delay

While Prokop titled this section of his motion as "pre-accusatory delay," his argument seems to be focused on the delay post-indictment.[25] Prokop argues that "the drastic delay and lack of a speedy trial" prejudiced him. This contention is surprising given the parties' representation about the complexity of this case and their collective requests for continuances before this case was reassigned to the undersigned in May 2012. In fact, at the July 5, 2012 status conference, Coolidge's counsel represented that Defendants estimated it would take 6-8 months to obtain discovery and another 12 months to process the information. (Dkt. no. 151.) The Government's counsel gave an estimate of 2 and 1/2 to 3 and 1/2 months to complete discovery. (*Id.*) The Court set trial for July 2013 and granted Defendants' two continuance requests over the Government's objection. (Dkt. nos. 151, 243, 246, 247, 264.) The Court granted these continuances based on counsel for Defendants' representation as to the case's complexity, the need for them to process and review voluminous discovery and the need for Defendants to adequately prepare for trial. Prokop cannot seek delay of trial because of the need to

---

[24]The Court also informed counsel of a note at the start of the day from another juror (Juror 6) who indicated that deliberations beyond that day would create a hardship for him. The Court informed counsel it would make inquiry with this juror at the end of the day. Again, there was no objection from counsel. No inquiry was conducted as the jury reached a verdict that afternoon.

[25]To the extent Prokop's argument is that he is entitled to a new trial because of pre-indictment delay, the Court agrees with the Government that Prokop has not demonstrated how he is prejudiced by the delay.

process discovery information in order to properly prepare for trial and then claimed that he was prejudiced by the same delay. *See United States v. Lewis,* 980 F.2d 555, 562 (9th Cir. 1992) ("Where a defendant's own actions contribute to the need for an 'ends of justice' continuance under [the Speedy Trial Act] the defendant cannot complain that a continuance violates his or her speedy trial rights."), abrogated on other ground by *Bloate v. United States,* 559 U.S. 196 (2010).

### 4.    Claim of Proffered of Proof Denied

Prokop argues that he should be entitled to a new trial because the Court denied his offer of proof as to what certain witnesses on his witness list would testify to if permitted to testify. Prokop does not explain the basis for his request or why denial should result in a new trial. Based on Prokop's request to make an offer of proof at the Government's case, the Court understands Prokop to take the following position. The Court had denied his motion to dismiss based on the alleged ambiguities in certain provisions of IRC § 44. (Dkt. no. 357.) The Court found that the allegations of fraud in the Indictment do not rest entirely on IRC § 44. (*Id.*) The Court further noted that whether IRC § 44 was ambiguous as applied to a home-based business or modification to a website appeared to have no connection to the Government's ability to prove the charges in the Indictment. (*Id.*) The Court also noted that Prokop may again seek dismissal if the Government were to offer evidence at trial that implicates the allegedly ambiguous provisions of IRC § 44. (*Id.*) At the close of the Government's case, Prokop requested to make an offer of proof of evidence he would offer to support the argument he made in his motion to dismiss as to the ambiguity in the tax law at the time of the charged conduct. The Court found that such an offer of proof was unnecessary because the case as presented did not implicate the allegedly ambiguous provisions of IRC § 44. Prokop has not persuaded to the Court to reconsider its decision. Nor has he demonstrated that the Court's decision to deny his request to make an offer of proof compels a new trial.

///

**VIII.    CONCLUSION**

The Court notes that the parties made numerous arguments and cited to evidence and cases not discussed above. The Court has reviewed these arguments and cases, evaluate the evidence and determines that they do not warrant discussion as they do not affect the outcome of the issues raised in Defendants' motions.

It is ordered that Defendants' motions to join (dkt. nos. 465, 468, 469, 471) are granted.

It is further ordered that the following motions are denied: (1) Coolidge's Motion for New Trial (dkt. no. 464); (2) Rodrigues' Motion for New Trial (dkt. no. 466); (3) Rodrigues' Motion for Acquittal (dkt. no. 470) (dkt. no. 471); and Prokop's Motion for Judgment of Acquittal and/or New Trial (dkt. no. 467).

DATED THIS 28th day of January 2015.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE